UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 3:03CR-152 (PCD) |
| | : |
| v. | : April 6, 2005 |
| | : |
| ROBERT KELLER and | : |
| MICHAEL MAZZARIELLO | : |

**Government's Sentencing Memorandum**

The Government respectfully submits this Sentencing Memorandum with regard to defendants Robert Keller and Michael Mazzariello who are currently scheduled for sentencing on March 31, 2005 at 9:00 am.

Defendants Keller and Mazzariello were indicted on May 22, 2003 by a federal grand jury sitting in Hartford, Connecticut. Each of the seven counts of the Indictment name both Keller and Mazzariello as defendants. In Counts One through Three, the defendants were charged with mail fraud in violation of 18 U.S.C. §§1341 and 2. In Counts Four through Six, the defendants were charged with embezzling from an insurance company engaged in interstate commerce, in violation of 18 U.S.C. §§1033(b)(1)(A) and 2. In Count Seven, the defendants were charged with conspiracy to defraud an Agency of the United States.

On September 1, 2004, defendants Keller and Mazzariello both pleaded guilty to Counts One and Seven. In the plea agreements, each defendant reserved the right to argue the loss figure, and therefore the applicable guideline range is lower than the Government's calculation. Although, defendant Keller filed a sentencing position claiming a lower loss calculation, the Government has recently been informed that both defendants are now willing to concede that full amount of the fraud, and Government's Guidelines calculation are correct. The Government

calculates the loss figure to be between $350,000 and $500,000. The guidelines calculations based on this amount of loss and the characteristics of this case, result in a range of 21 to 27 months of imprisonment, a fine range of $5,000 to $50,000 and a term of supervised release of two to three years.

For the reasons set forth in this memo, the Government submits that a sentence within the applicable Guidelines range is appropriate.

**THE SCHEME**

As described in Count One, over a period of two-plus years, the defendants devised and engaged in a scheme through which they convinced an outside consultant to submit false bills to their employer. They approved the bills and their employer paid the bills. Although the money was in the custody of the consultant, the defendants controlled the money and caused it to be spent as they pleased.

The outside consultant, William Hoyt, and his company, Softcraft Laboratory, Inc., provided legitimate consulting service to New York Life Insurance Company. However, in the course of the scheme, the defendants directed William Hoyt, (hereinafter "Hoyt") to submit bills to New York Life insurance Company which were false. Hoyt was directed to prepare bills or invoices which appeared to be for services which had been rendered in the past by the consultant or his company, whereas the defendants knew the bills were in fact padded or completely false. As directed, the consultant, William Hoyt, President of Softcraft Laboratory, Inc., mailed the invoices to New York Life Insurance Company, Inc. One or both defendants approved payment of these invoices and New York Life Insurance Company, Inc. (hereinafter "New York Life") mailed payment to Softcraft Laboratory, Inc. (hereinafter "Softcraft").

Although the money paid by New York Life was in the custody of the consultant, Keller and Mazzariello controlled this money and it was spent the way Keller and Mazzariello saw fit. Over more than two years, Hoyt was directed to obtain and provide to the defendants money and various items. The directions to Hoyt were usually provided by Keller; but, at times, directions were also issues through a subordinate, Chris Huydic.[1]

The items obtained or provided by Hoyt included cash, cashier's checks, money orders, high-end computers, flat screen monitors, printers, scanners, and other high-end computer equipment, personal electronics such as video camcorders, and a variety of other items. The items were usually for Keller and Mazzariello, however, at times they also directed that Huydic receive certain items as well.

## HOW IT BEGAN

The Government agrees with the defendants' assertions that they did not initially set out to line their own pockets through a false billing scheme involving Softcraft. But, at what point did the false billing system they had in place develop into the fraudulent scheme which financially benefitted them and harmed New York Life? Below is a description, based on the evidence amassed in this case, of how the fraud scheme developed and when the financial harm to New York Life began to occur.

First False Invoice–Not Beginning of Scheme

On December 16, 1997, Keller interviewed William Hoyt regarding the prospect of Hoyt and his company, Softcraft Laboratory, Inc., providing computer consulting services to New

---

[1] Huydic was a New York Life employee under Keller and Mazzariello. Huydic, who had been a teacher before joining New York Life, lived across the street from Mazzariello, was hired at New York Life by Mazzariello, and commuted into New York daily on the train with Mazzariello and Keller.

York Life. That day, Keller and Hoyt signed a contract which effectively made Hoyt a consultant. The same afternoon, after Hoyt had returned to Connecticut, Keller called Hoyt and instructed him to prepare and send in a bill for $50,000. Keller conveyed to Hoyt that he had extra funds in his budget and that Hoyt could work off the $50,000 in 1998. Keller instructed Hoyt what to write on the bill, making it look like services had already been rendered by Softcraft. The following day, in keeping with Keller's instructions, Hoyt submitted the invoice to New York Life. This bill was false in that it did not state that it was for services to be rendered in the future. This was against New York Life policy, and the invoice would not have likely been paid by New York Life if the invoice had correctly stated that payment was for services to be rendered in the future by an unproven consultant.

Throughout the first quarter of 1998, approximately, Hoyt and his firm worked off this $50,000 credit balance. His firm provided the full number of consulting service hours for which the firm had been paid. He submitted itemized bills showing the hours worked and further reflecting a credit balance. The invoices were submitted to Keller and Mazzariello's department. In or about the end of the first quarter in 1998, Keller directed Hoyt to submit another invoice for approximately $80,000. Again, Keller instructed Hoyt what to write on the invoice, and again, the invoice falsely appeared to be for computer consulting services provided in the past. Again, Hoyt worked off a significant amount of the credit balance by providing computer consulting services on an hourly basis. However, Keller also began to instructing Hoyt to slow down use of the credit balance, and instead, submit ordinary invoices, which made no mention of the credit balance. Again, Hoyt did as instructed, and New York Life paid these bills.

**FINANCIAL HARM WHEN SCHEME EVOLVES**

As shown below, the seminal fraud occurred around February 1998 and the fraud and

financial harm come into fully bloom by April 1999.

One day in February 1998 when Hoyt was at New York Life, Keller approached Hoyt and asked whether Hoyt/Softcraft could repair the scanner at Mazzariello's home. Hoyt indicated he could or could find someone to do it. Keller then asked if Hoyt could simply purchase a replacement, instead. Hoyt indicated he could do that. Keller, then instructed Hoyt to convert the cost of the new scanner to consulting hours billed on a Softcraft invoice to be submitted to New York Life. Hoyt did as Keller directed. After the scanner was shipped to Hoyt's business in Connecticut, Keller went over after work one night and picked it up. Keller explained to Hoyt that this was an easier way for him to get things done, than to deal with the proper channels at New York Life.

In this way, the first small item started the scheme. A new scanner apparently for Mazzariello's home was paid for with New York Life money. The Corporate Information Department at New York Life was deceived–they were informed that a certain number of hours of consulting services had been rendered and thought payment was for those services.

In November 1998, steps were taken to create the "contingency/reserve/surplus." Keller directed Hoyt to submit three completely false invoices, two for approximately $75,000 and one for approximately $49,000. Keller again instructed Hoyt what to write on the invoices, causing each bill to appear as though it was for services rendered in the past. Again, Hoyt did as directed. This time, because two of the invoices were over $50,000, Mazzariello had to approve payment of these invoices (in addition to Keller's approval). In each case, Mazzariello's and Keller's approvals certified to the Corporate Information Department (which responsible for processing check requests and mailing payments) that the services on the invoice had been rendered as stated. New York Life paid the approximately $199,900 charged in these invoices in December,

1998. In this way, the "surplus" or "contingency/reserve fund" was created.

Hoyt did not necessarily know at this point that his firm would not work off the $200,000 credit balance by providing hourly consulting services. However, that became clear over the next five months.

In December 1998, Keller directed Hoyt to obtain three Dell "XPS 450" computers at a total approximate cost of $10,460–these computers were for the homes of Keller, Mazzariello, and Chris Huydic.

In March 1999, Keller also requested two more computers from Hoyt–these were IBM Thinkpads (laptop computers) which cost approximately $4,000 each–one for Keller and one for Mazzariello. In addition, he discussed with Hoyt obtaining three "Clarion" car computers-one for Keller, one for Mazzariello, and one for Hoyt. Hoyt dragged his feet on these purchases because he was beginning to doubt the purchases were to benefit New York Life.[2]

In April 1999, Keller advised Hoyt that he and Mazzariello wanted Hoyt to provide them with approximately $3,500 each in "untraceable cash." Keller explained that it was to cover the expense of a golf outing for which New York Life would not pay.

In April 1999, Keller also instructed Keller to look into purchasing three golf time shares in Hilton Head, North Carolina at a cost of $24,000 each–one for Keller, one for Mazzariello, and one for Hoyt. Keller indicated that Hoyt should bill false hours against the $199,000 credit balance from November/December 1998 invoices to cover the cost of the time shares.

In April 1999, Keller and Mazzariello also expanded the scheme beyond cash and equipment. Hoyt was informed that he/his company would be receiving an invoice from Zephyr

---

[2] Upon researching the Clarion car computers, Hoyt learned that they did not yet perform all the functions Keller was seeking, and therefore, Hoyt was able to dissuade Keller from pursuing these purchases.

Services which claimed to be for consulting services. Although Softcraft and Hoyt had never done any business with Zephyr Services, Keller instructed Hoyt to pay the invoice and convert it to hours, i.e. pad Softcraft's invoices to New York Life to cover the cost. The first Zephyr Services invoice to arrive at Softcraft was dated April 2, 1999 and it was for $23,896.

Zephyr Services was the name of the consulting company of James Paulsel. Paulsel, Keller, and Mazzariello had worked together at their previous employer–PNC Bank in Pennsylvania. In September 1998, Paulsel began working as a consultant for New York Life, although he lived in New Mexico. While a consultant, Paulsel covered his own travel expenses back and forth to New York. In April 1999, he was hired as an employee (at the urging of Mazzariello), yet he continued to live in New Mexico and commuted to New York a portion of each month. Paulsel desired to have his traveling/commuting expenses paid when he was converted to employee, but New York Life did not include this as part of his compensation package.

Mazzariello and Keller instructed Paulsel to submit his commuting expenses to Softcraft, in the form of an invoice which claimed that Paulsel, (Zephyr Services), had provided consulting services to Softcraft in an amount equal to his commuting expenses. Paulsel did as instructed as received payment. And, Hoyt did as he was instructed, paid Zephyr Services, and then padded three Softcraft invoices to cover the cost.

About this time frame, Hoyt initiated contact with an attorney because he did not want to be involved in a scheme which was obviously fraudulent. Hoyt ultimately hired Attorney Tom Murphy and in July 1999, they met with the FBI and the United States Attorney's Office. Hoyt agreed to cooperate in an investigation. Thereafter, Hoyt recording his contacts with Keller, Mazzariello, and Huydic through the use of a personal body recording device. In addition, Hoyt

saved relevant email and telephone voice mail. From this point forward the fraud proceeded as follows.

On July 7, 1999, with the knowledge of the FBI, Hoyt complied with Keller's directions and purchased two IBM Thinkpad laptop computers. These items cost $6,897.02. Hoyt converted $4,080 of this to false consulting hours, thus creating a "padded invoice" which was submitted to New York Life and subsequently paid by New York Life. In addition, Hoyt provided $7,000 cash to Keller for the golf outing reimbursement. The FBI recorded the serial numbers of the computers and photocopied the cash.

Over the course of 1999, the scheme continued and Hoyt was directed by the defendants to obtain or pay for the following[3]:

| ITEM | VALUE/COST | APPROXIMATE DATE |
|---|---|---|
| Zephyr Services Invoice | $ 23,896 | 4/2/99 |
| IBM Thinkpad Laptop Computers (2) | $ 6,897.02 | 7/7/99 |
| CASH | $ 7,000 | 7/16/99 |
| Scsi Controllers (computer accessory) (2) | $ 468. | 7/19/99 |
| Dell "XPS 550" Computers (3) | $ 6,241.28 | 7/20/99 |
| DVD Drives (2) | $ 715.88 | 8/24/99 |
| SNET Bills (2) | $ 1,087.50 | 9/15/998 |
| LCD Computer Monitors (**6**), Epson Printers (3), and Ink Cartridges (12) | $ 22,470.41 | 10/4/99 |
| Michael's Jeweler's (100 NYL logo Bulova watches) | $ 10,123 | 11/5/99 |
| SNET bill | $ 737.86 | 11/5/99 |
| American Express bill | $ 3,935.79 | 11/5/99 |
| Electrical Generators (4) | $ 11,147 | 11/5/99 |
| HP Scanjet 6350's printer/scanners (3) | $ 1,445. | 11/9/99 |

---

[3] This list is taken from ATTACHMENT A which is the schedule entitled NEW YORK LIFE FUNDS DIVERTED BY ROBERT L. KELLER, Jr., et al. created by FBI Special Agent Tim Egan based on the investigation as well as invoices, receipts, and other records obtained from Hoyt.

| | | |
|---|---|---|
| Zephyr Services Invoice | $ 16,425 | 11/11/99 |
| CASHIER'S CHECKS | $ 10,000 | 12/2/99 |
| Sony DVD Players | $ 3,469 | 12/16/99 |
| Computer Memory Sticks | $ 285.46 | 12/16/99 |
| Computer Cyber Frame | $ 771.73 | 12/16/99 |
| American Express bill | $ 5,982.90 | 12/21/99 |
| American Express bill | $ 5,742.59 | 12/21/99 |

The above list is taken from ATTACHMENT A, which shows the above information, and, in addition, when and how much of the above items were converted hours on "padded" invoices. If not converted to hours on a "padded" invoice, then the expense was paid for out of the "surplus/contingency/reserve."

Between December 1998 and October 1999, Hoyt was directed to supply the defendants with a total of eight computers, six monitors, and three printers, among other items. While the defendants may claim that they needed or used these items for New York Life's benefit, it should be noted that New York Life provided the defendants with a computer at work and/or a laptop. If AN additional computer was needed at their home, special approval would be required to authorize this expense and it would be purchased or leased through approved vendors with whom New York Life had negotiated contracts. Obviously, that is not what happened here. Further, it is important to know that although Mazzariello and Keller were in the "Emerging Technology" section at New York Life, their duties did NOT include evaluating PC's. Thus, they cannot claim that they were purchasing multiple computers, monitors, etc. to evaluate them to see if they were going to recommend that New York Life begin buying/using a certain brand of PC, monitor, or printer, for example.

The items obtained by Hoyt were usually picked up from Hoyt by Keller or Huydic and

then distributed to the homes of Keller, Mazzariello, and Huydic.  At times, Hoyt received instructions from Chris Huydic regarding what items to purchase.  However, Keller and Mazzariello were aware of the items ordered.  In a recorded conversation between Hoyt and Mazzariello on December 9, 1999, the following exchange occurred:

| | |
|---|---|
| Hoyt: | Chris said bill back the uh, Sony stuff... |
| Mazzariello: | Yeah |
| Hoyt: | ...in the usual way. |
| Mazzariello: | Okay, I don't know what the usual way is though... |
| Hoyt: | Okay. |
| Mazzariello: | Just do it the way you normally do stuff..um..um..I know that they have gotten..the only thing..don't do..you usually ship to the off..right to the office? |
| Hoyt: | No, they usually come pick it up.  Usually. |
| Mazzariello: | Oh, they come here? |
| Hoyt: | Yeah.  (Unintelligible.) |
| Mazzariello: | Then just..do..do the same thing.  I don't..I..there's some things that I just..I don't even know what he does and I don't think I even want to know what he does. |
| Hoyt: | Okay. |
| Mazzariello: | But um. |
| Hoyt: | Is it okay that I..that I talk with him about billing arrangement? |
| Mazzariello: | Oh, to..to Bob and Chris? |
| Hoyt: | To..to Chris, specifically. |
| Mazzariello: | Oh yeah, oh yeah, and did Chr..Chris place the order? |
| Hoyt: | Yeah, yeah. |
| Mazzariello: | Um..touch base with Bob... |
| Hoyt: | Okay. |
| Mazzariello: | ...touch base with Bob.  I don't know wh..however Bob it is normally handles stuff..like that, that's fine.  I know that um..that uh..uh..I know that there's a couple of toys..all the toys.  Uh, the one that we're gonna use for the agents is the one that uh, Chris'll probably be using. |
| Hoyt: | Okay. |

(Excerpt Transcript, ATTACHMENT B-3, 12/9/99 conversation between Hoyt and

Mazzariello.  See Also Excerpt Transcripts, ATTACHMENT B-1, p.9-13, 12/2/99 conversation between Hoyt and Huydic, and ATTACHMENT B-2, 12/3/99 conversation between Hoyt and Keller.)

Among other things, the above conversation illustrates that (1) Mazzariello was a knowing and willing participant in this scheme, and (2) that he relied on Keller to attend to the nitty gritty details of getting things done and making it happen.  The conversations in Attachments B-1 and B-2 further show that Mazzariello, Huydic, and Hoyt were aware and jointly involved..  On 12/2/99, Huydic says Mazzariello wanted Hoyt to order certain items.  On 12/3/99 Keller tells Hoyt not to tell anyone about their arrangement because the company "would flip" if they knew.  "Nobody beyond Mike and I knows what's happening."  (Attachment B-2. p.2).  In that same conversation, Keller tells Hoyt that Mazzariello wants to invest the $200,000 (p.3), that it is a sin for it to be just sitting out there, that Mazzariello assumed Hoyt had it invested to get something out of it (p.3, 4).  Keller also tells Hoyt that Mike said to buy Vignette stock with it. (P.5)  Keller also shares his investment advice, when he tells Hoyt, "we're all young...be aggressive with it." (P.6)  Less than a week later, when Hoyt talks with Mazzariello, he makes reference to Mazzariello's desire to invest the money in Vignette stock.

Hoyt: And...and Bob also mentioned that you wanted the...the uh..to invest that...that money.  And I didn't...

Mazzariello: What do you think about that?

Hoyt: Uh...uh Vignette may be late in the game..I don't..I mean I may be late in the Vign..Vignette game.

Mazzariello: I cannot believe Vignette stock.  I was with them two weeks ago..uh three weeks when we were in Boston.  Man oh man they go their shit together.

Attachment B-3, p.2.

Mazzariello does not deny that it was his idea to invest the surplus in Vignette stock. To the contrary, the progression of the conversations and the context, shows he is aware of the stock purchase idea and very impressed with Vignette.

**SURPLUS INCREASE and SCHEME CONTINUES**

Near the end of 1999–in November, Keller instructed Hoyt to increase the surplus. He directed him to submit three invoices for just under $40,000 each. Again, Keller directed Hoyt what to write on the invoices causing them to appear to be for services rendered in the past. Hoyt submitted the invoices as directed and New York Life mailed payment to Softcraft.

In 2000, the scheme continued. Below is a list of the items Hoyt was directed to obtain or pay for during the year 2000.[4]

| ITEM | VALUE/COST | APPROXIMATE DATE |
|---|---|---|
| Video Direct-Sony Camcorders (3) | $ 4,714.20 | 2/14/00 |
| Video Direct-Memory Sticks | $ 495.80 | 2/15/00 |
| American Express | $ 6,215.89 | 3/13/00 |
| Hammacher Schlemmer | $ 6,469.50 | 5/4/00 |
| American Express | $ 4,700 | 5/9/00 |
| American Express | $ 6,215.89 | 5/9/00 |
| Sony Direct | $ 1,081.30 | 5/10/00 |
| Sony Direct | $ 672.31 | 5/10/00 |
| Cashier's Checks (2)–1 for MM, 1 for RK | $ 7,500. | 5/25/00 |
|  | $ 7,500. | 5/25/00 |
| American Express | $ 5,218 | 7/3/00 |
| American Express | $ 5,723 | 7/3//00 |
| Zephyr Services | $16,425. | 7/19/00 |
| Cashier's Checks (3)–payable to RK | $ 8,972.78 | 8/17/00 |

---

[4] This list is also taken from ATTACHMENT A which is the schedule entitled NEW YORK LIFE FUNDS DIVERTED BY ROBERT L. KELLER, Jr., et al. created by FBI Special Agent Tim Egan based on the investigation as well as invoices, receipts, and other records obtained from Hoyt.

| ITEM | VALUE/COST | APPROXIMATE DATE |
|---|---|---|
|  | $ 8,818.56 | 8/17/00 |
|  | $ 5,215.80 | 8/17/00 |
| American Express | $ 4,500. | 9/21/00 |
| American Express | $ 2,500. | 10/20/00 |
| American Express | $ 2,500. | 10/20/00 |
| Dell Pentium III Computers (3) 933 MHz | $ 4,989.42 | 10/24/00 |
| Dell Pentium III Computers (3) 1 GHz | $ 9,870.71 | 11/17/00 |
| VISA Payment | $ 1,500. | 11/18/00 |
| MASTERCARD Payment | $ 3,000. | 11/18/00 |
| American Express | $ 3,000. | 11/18/00 |
| American Express | $ 3,000. | 11/18/00 |
| Sony Radios, headphones, walkmans, speakers, Motorola walkie-talkies, Sieman's pocket reader | $ 7,269.07 | 11/19/00 |
| Back UPS Pro 650's (3) | $   844.66 | 11/20/00 |
| Cashier's Checks (2)–1 for MM, 1 for RK | $ 6,000. | 11/20/00 |
|  | $ 6,000. | 11/20/00 |
| American Express | $ 2,000. | 12/8/00 |
| American Express | $ 2,000. | 12/8/00 |
| MASTERCARD Payment | $ 3,000. | 12/8/00 |
| VISA Payment | $ 1,500. | 12/8/00 |
| Michael's Jeweler's (100 NYL logo Mont Blanc pens) | $ 11,130 | 12/8/00 |
| Cashier's Checks (2)–1 for MM, 1 for RK | $ 6,000. | 12/8/00 |
|  | $ 6,000. | 12/8/00 |

At the start of 2001 the scheme continued briefly. Below is a list of the items Hoyt was directed to and did provide to Keller.[5]

| ITEM | VALUE/COST | APPROXIMATE DATE |
|---|---|---|
| American Express | $ 6,500 | 1/12/01 |
| American Express | $ 6,500 | 1/12/01 |

---

[5] This list is also taken from ATTACHMENT A which is the schedule entitled NEW YORK LIFE FUNDS DIVERTED BY ROBERT L. KELLER, Jr., et al. created by FBI Special Agent Tim Egan based on the investigation as well as invoices, receipts, and other records obtained from Hoyt.

Near the end of 2000–in early December, Keller again instructed Hoyt to submit invoices which would further increase the surplus. Keller directed Hoyt to submit four invoices for just under $50,000 each. Again, Keller directed Hoyt what to write on the invoices. Although Hoyt submitted these invoices as directed, they were not paid by New York Life. The scheme was revealed soon thereafter. On January 21, 2001, search warrants were executed at the homes of Keller, Mazzariello, and Huydic. Computer equipment, electronics, and various items among those listed above were found in their homes. An envelope of cash was also found in Mazzariello's dresser and he admitted to the agents it was proceeds of the scheme.

As you can see from the list above, six Dell Pentium computers were obtained within one month–three on 10/24/00 and three on 11/17/00. Of these, the first three were going to be returned and the second three obtained, instead. In a series of voice mails, however, Keller informs Hoyt that they have decided to keep the first three, after all, and still obtain the three additional ones. See Attachment C, p.1-2.

The defendants both claim that many items, including the computers, were *legitimate* business expenses. They had obtained eight computers the year before and were now obtaining six more. This does not include the authorized computers New York Life provided for them through proper channels. (The computers New York Life would consider legitimate expenses). At some point, even the defendants should acknowledge the significant excess and the absurdity of claiming that all of these items were legitimate business expenses. Further, in the course of the searches, the agents located a number of the items, including computer equipment, in the children's rooms. Therefore, the Government finds it disingenuous for the defendants to claim that all the computer equipment constituted a *legitimate business expense* and was used for New York Life related business purposes.

**ABERRANT BEHAVIOR CLAIMS**

The defendants' fraudulent activities went on for more than two years. Their activities involved many variations on theme of spending New York Life's money they way they saw fit. It spread beyond the scheme described above. It also included having Chris Huydic make up fake invoices and submit them to New York Life for payment, which resulted in each defendant getting three years of Direct TV at their homes paid for by New York Life. Their fraudulent activities also included directing Paulsel to pad his consulting invoices to New York Life to cover the portion of a sign-on bonus Keller and Mazzariello believed would not be approved by New York Life.[6] These activities and the efforts to conceal the income received from the scheme described above, demonstrate that an aberrant behavior departure is clearly inappropriate for either defendant in this case.

The circumstances of this case do not warrant a reduced sentence on the basis of aberrant behavior. The sentencing guidelines provide that a departure may be warranted in exceptional circumstances where the defendant committed "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. 5K2.20. In making the determination as to whether the court should depart on the basis of aberrant behavior the court may consider the defendants "(A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Id.

---

[6] This instance of directing Paulsel to pad his invoices occurred when he was being converted from consultant to employee. This activity occurred before the defendants' directed Paulsel to send fake invoices to Hoyt/Softcraft which claimed to be for consulting, but were actually to cover his commuting expenses from New Mexico they converted him into a New York Life employee.

The defendants crimes and fraudulent activities were not a single criminal occurrence or single criminal transaction. Defendant Keller has argued that his conduct constituted a single criminal transaction because it was one criminal scheme. *Citing* United States v. Hued, 338 F. Supp. 2d 453 (S.D.N.Y. 2004). Hued, involved a defendant who allowed her home to be used by another party for drug trafficking. This behavior only went on for weeks, and the court emphasized that this crime was one of "omission." The court concluded that because her decision to allow the drugs to remain in her home "constituted a single course of conduct and single crime" it was therefore a single criminal occurrence. Id. at 458-59.

The facts of this case are clearly distinguishable. Defendant has plead guilty to Mail Fraud in violation of 18 U.S.C. §1341 and Conspiracy to Impede and Impair the Lawful Functions of the IRS in violation of Title 18 U.S.C. §371. Here we have two crimes that occurred over a period of approximately two years and involved many transactions. In United States v. Petrelli, decided by the same judge as Hued, the court found that a defendant convicted of conspiracy to commit mail fraud was not entitled to departure based on aberrant behavior where conspiracy lasted for more than a year, and defendant took various steps in carrying out the scheme. United States v. Petrelli, 306 F. Supp. 2d 449, 452-53 (S.D.N.Y. 2004).

The determination that the defendants' offenses were not a single criminal occurrence or single criminal transaction renders an aberrant behavior departure improper and thus makes it unnecessary to consider any additional factors. However, even if the court were to consider those factors, departure would be inappropriate. The conduct of each defendant also fails the requirements of aberrant behavior because it required significant planning and was of extended duration. *See* United States v. Hollier, 321 F. Supp. 2d 601, 603 (S.D.N.Y. 2004) (downward departure was not available regardless of defendant's purported good character where scheme

was of several years' duration and involved careful planning).

The defendants participated in a scheme whereby a third party consultant from Softcraft would submit invoices to New York Life Insurance Company that contained charges for services that were not provided. One or both defendants would approve these invoices and the funds would accumulate at Softcraft or be spent as directed by the defendants. Furthermore, in an attempt to defraud the IRS by disguising the nature of the illegal funds they were receiving, defendant Keller requested a letter from Softcraft falsely reflecting that he and Mazzariello had done consulting work that had nothing to do with New York Life in any way. See Attachment D. All of this took place over a period of approximately two years.

The defendants' actions were motivated by pecuniary gain and desire to be free from budgetary oversight of their employer. The defendants knew that it was wrong to hide the money from New York Life and use the way they wanted. Keller told Hoyt to be sure not to tell anyone else at New York Life about their activities because no one else knew and the company would "flip" if they knew. This money was spent they saw fit– for camcorders, fourteen extra computers, six extra monitors, eleven (11) cashier's checks totaling $72,007.14, cash totaling $7,000, fifteen (15) American Express bill payments totaling $73,848.17, four Visa/MasterCard payments totaling $9,000, four generators totaling $11,147, or 200 pens and watches totaling $22,253 (only a portion of which they distributed as gifts to their colleagues) and on many other items detailed above and on Attachment A. This was not a noble fraud. This was excessive, it was largely for personal benefit and it demonstrates a lack of restraint often seen when one spends illegal money. It was ill-gotten money from New York Life.

The long term, frequent transaction nature of the scheme, the constant planning on what to obtain next and how to bill back the cost, the other ways the defendants defrauded New York

Life, and the personal benefits they repeatedly obtained are all factors which illustrate why this was not a single instance of aberrant behavior for either defendant an why it would be improper to depart on this basis. Furthermore, although the defendants have accepted responsibility by pleading guilty, a separate guidelines adjustment accounts for that.

## CONCLUSION

Given the fact that the defendants entered pleas of guilty, the government is recommending a three-point reduction for acceptance of responsibility regarding each defendant.

Defendant Keller's occupied the active role as the "make it happen guy" in this conspiracy. His repeated claims in the sentencing memorandum that the fraudulently obtained funds went to pay for *legitimate business expenses*, should be carefully scrutinized in light of the fact that the fifteen (15) American Express bill payments totaling $73,848.17 and four Visa/MasterCard payments totaling $9,000, all were credited as payment on his accounts. Hewas the one pickingup the cash and the cashier's checks from Hoyt. He was the one providing insulation to Mazzariello. The active role he took on in this scheme, and financial benefits which inured to him personally, demonstrate that his involvement in the offenses warrants a sentence in the middle of the guidelines range of 21 to 27 months.

The government notes that defendant Mazzariello does not quarrel with the Government's calculation regarding the extent of the fraud. He does however, seek to parlay his lack of involvement in the every-day, nitty-gritty details of the scheme, i.e. an ostrich-with-its-head-in the-sand, into an argument as to why he is less culpable. He claims that because he did not know about certain details of Keller's fraudulent activities, he therefore, did not agree to or condone all the ill-gotten items that the scheme ended up yielding to Keller. It should be noted

that while Mazzariello was not the one primarily directing Hoyt, Mazzariello was a complicit recipient, rode the train daily with Keller and Huydic–where they discussed what to obtain next–and he was Keller's supervisor.  He knew Keller was a "get-it-done" kind of guy who produced results for his boss without burdening the boss with the details.  Keller's intensive and transparent involvement in this scheme should not be permitted to minimize Mazzariello's involvement in this conspiracy.  Nor should Mazzariello's criminal culpability be minimized because his position insulated him from the dirty work.  Therefore, the Government recommends a sentence within the guidelines range of 21 to 27 months.  The fact that he was often focused spending the funds--as he saw fit--but on business-related items such as having Paulsel's travel paid illicitly, rather than for his personal American Express charges may constitute a valid reason for a sentence at the low end of this range.

    Respectfully submitted,

    KEVIN J. O'CONNOR
    UNITED STATES ATTORNEY


    ANASTASIA M. ENOS
    ASSISTANT UNITED STATES ATTORNEY
    450 Main Street
    Hartford, CT 06103
    Telephone No. (860) 947-1101
    Federal Bar No.  CT 24192

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the within and foregoing was served via facsimile and first-class mail this 6th day of April, 2005 to the following:

David Gruberg, Esq.
Jacobs, Grudberg, Belt, & Dow
350 Orange Street
New Haven, CT 06503

Hubert J. Santos, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106

Jaqueline Carroll
U.S. Probation Officer
157 Church Street
New Haven, CT 06510

_____
ANASTASIA M. ENOS
ASSISTANT UNITED STATES ATTORNEY