UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA     :    CRIM. NO.: 3:03CR152 (PCD)

VS.

MICHAEL MAZZARIELLO      :    APRIL 5, 2005

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Michael Mazzariello respectfully submits this memorandum as an aid to the Court in connection with his sentencing, scheduled for April 7, 2005 at 9:00 a.m. This memorandum will address certain factors relevant to the sentencing decision, such as the defendant's background, our position concerning application of the Sentencing Guidelines, and other factors that in our view warrant either the imposition of a non-Guidelines sentence or a departure from the guidelines -- whatever they are determined to be. As we discuss below, we believe that defendant's exemplary background and past good works, family obligations, and need to earn money to pay restitution and support his family all militate strongly in favor of a non-custodial sentence in this case.

I.    PERSONAL BACKGROUND

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that mandatory application of the federal sentencing guidelines violated the United States Constitution. The remedy announced by the Court in Booker rendered the guidelines advisory

in nature, one of many factors under 18 U.S.C. § 3553(a) to be considered in the sentencing decision.

A proper sentence, even under the former mandatory guideline system, of necessity took into account the individual characteristics of the defendant. Early on in the sentencing guideline era, the Second Circuit explicitly rejected the argument that offender characteristics are irrelevant. See United States v. Lara, 905 F.2d 599, 604 (2d Cir. 1990)(guidelines not intended to "straitjacket a sentencing court," or prevent court "from exercising discretion, flexibility or independent judgment"). Section 3553 lists "the nature and circumstances of the offense and the history and characteristics of the defendant" as the first factor to be considered by the court in imposing sentence. 18 U.S.C. § 3553(a)(1). Accordingly, we discuss Mr. Mazzariello's background and personal characteristics at some length, as they are central to the sentencing decision.

Michael Mazzariello is 44 years of age. He lives in Hamden with Jeanne, his wife of 22 years, and their three children -- Kristen, 18; Lauren, 16; and David, 13. The family has lived in Hamden since 1989, and Mrs. Mazzariello grew up in the Hamden/North Haven area. The children have attended Catholic schools. Kristen and Lauren are currently enrolled at Sacred Heart Academy, where Mrs. Mazzariello teaches; David is a student at St. Rita's School.

Mr. Mazzariello was raised in the greater Boston area, the middle child of a middle-class Italian-American family. His father

2

worked as an inspector for the Commonwealth of Massachusetts, and his mother was a secretary.  Many of his family members have submitted letters to the Court.  They describe Mr. Mazzariello's work ethic at a young age; he worked in high school and was able to buy a car at age 17.  Upon graduating from Xaverian Brothers, a Catholic high school in Westwood, Massachusetts, he enrolled at Stonehill College in Easton, Massachusetts to pursue a pre-med and engineering curriculum.  At Stonehill, he met his wife Jeanne, and the couple began dating their freshman year.  Mr. Mazzariello later transferred to Northeastern University for the last two years of college, and graduated in 1982 with a degree in electrical engineering.

Mr. Mazzariello continued dating Jeanne even after transferring schools, and they married in October 1982.  He began his career working first as a systems programmer and later a systems engineer for the Foxboro Company, living in Rhode Island and working in Massachusetts.  The couple wanted to re-locate to Connecticut, closer to Mrs. Mazzariello's large family, before starting a family of their own.  In 1985, Mr. Mazzariello accepted a job with Bunker Ramo, and they moved to Wallingford, where they purchased a home.  Their initial attempt at having children ended tragically, with the birth of stillborn twins.  Their oldest daughter was born in 1987, and two other children followed, in 1988 and 1991.  In 1989, the Mazzariellos moved to the Hamden home where they still reside.

3

Mr. Mazzariello's career continued on a steady upward arc for 10 years with Bunker Ramo, which later was acquired by Olivetti and went through several corporate incarnations. He worked regularly with computer equipment in his job duties, in his office, at home, and while traveling for business. While at Olivetti/Bunker, Mr. Mazzariello met Judy Campbell, for whom he would work in a succession of positions. At Ms. Campbell's invitation, he left Olivetti in early 1995 and joined Midlantic Bank, where Ms. Campbell was a senior vice president. Midlantic was based in New Jersey, and Mr. Mazzariello had a grueling commute, requiring 2-2.5 hours of travel each way. During this period of time, he began working frequently from his home, averaging 3-4 days per month plus nights and weekends. His job duties included the evaluation of new technologies, and Midlantic provided a complete home office set-up.

Midlantic was acquired by PNC Bank, a Pittsburgh-based company, later in 1995. Later that year, Mr. Mazzariello accepted Ms. Campbell's invitation to join him in Pittsburgh; he managed a technology team of approximately 60 people. Mr. Mazzariello accepted this new position only on the condition that he not be required to move his family. The company allowed him to work under a "tele-commuter" schedule, under which he would typically travel to Pittsburgh on Monday, and return to Connecticut on Thursday or Friday. When not in Pittsburgh, he would work from his home, regularly working nights and weekends; his typical work-week was 70-80 hours. The demanding work schedule was a strain on his young

4

family, but his wife supported his efforts to provide for them, and Mr. Mazzariello tried as best he could to balance family and career obligations.

The Pittsburgh tele-commuting arrangement with PNC lasted approximately 18 months.  In 1997, Ms. Campbell had again accepted a new position, to New York Life ("NYL"), and in August 1997 Mr. Mazzariello agreed to join her there.  He was hired as a Vice President of Advanced Technology.  Ms. Campbell was New York Life's Chief Information Officer, and Mr. Mazzariello was later named Chief Technology Officer for the company, in essence working as Ms. Campbell's "right-hand" person.  Mr. Mazzariello occupied that position at NYL until January 2001, when the events that ultimately led to this prosecution first began to unfold.

With the move to NYL, Mr. Mazzariello's already-grueling schedule of commuting and work became even more demanding.  His typical day was as follows:  he would rise around 4 a.m., run and work out before getting ready for work.  He would usually leave his home at 5:10 a.m. to catch the 5:40 a.m. train into Grand Central, arriving at his office between 7:15 and 7:30.  After a day usually filled with meetings, he would return home by train, either working or napping during the ride, and usually arrived back at his house between 7 and 8 p.m.  He would eat and spend time with his children before they went to bed.  Once they were asleep, he typically would work at home from 10 p.m. to 2 a.m., answering emails that had accumulated during the day, conducting internet research, and

catching up on other work tasks.  Mr. Mazzariello averaged 2-3 hours of sleep per night.

Though it would seem impossible based on his work schedule, Mr. Mazzariello has always found significant time to devote to his community, in many different ways.  He has served a variety of roles at his children's schools, and has assisted with many functions and fundraisers.  He has faithfully served his church as well in a variety of roles, including as a member of the finance committee of two different parishes, St. Rita and St. Joan of Arc. He has also coached youth sports for years, both basketball and baseball, allowing him both to be involved with his children and to contribute to the community at large.  Numerous friends who have written to the Court in connection with this sentencing have emphasized Mr. Mazzariello's devotion to these efforts, and the positive impact he has had on the lives of both children and adults who have had the opportunity to work with him.

In 2000, the Mazzariello family suffered two significant medical hardships.  His middle daughter, Lauren, was diagnosed with scoliosis; she was 11 at the time.  The condition required her to wear a back brace, and she continues to deal with the problem.  Her medical treatment remains uncertain, and surgery remains a possibility.

Also that year, David Mazzariello, then 8 years old, was diagnosed with Juvenile Diabetes.  He currently wears an insulin pump to attempt to regulate his blood sugar, but his situation

fluctuates often.  As much as possible, the family has tried to treat David as any other active, growing boy, and he plays several sports (usually coached by his father).  However, there are also frequent crises to deal with, including seizures brought on by blood sugar fluctuations.  These most often occur in the middle of the night, when David will cry out because of a dramatic variation in his sugar level.  He must be restrained so that an appropriate nutrient may be given, and his sugar level returned to normal levels.  As David has grown, it has become increasingly more difficult for Jeanne Mazzariello, who is small, to handle him by herself when he is in a state of seizure.  Her oldest daughter has been able to help, but will not be around as often when she leaves to attend college this fall.

The challenge and burden of dealing with Juvenile Diabetes weighs heavily on Mr. Mazzariello, but he has responded with his typical determination.  He has become active in JD fundraisers and other group activities, and also tries to watch his son whenever he can.  They have tried as much as possible to allow him to live the life of a normal 13-year-old, but at the same time Mr. Mazzariello must watch him very carefully -- sometimes without his son knowing, so he will not be embarrassed -- because David is prone to such dramatic swings in his blood sugar levels.  Friends of the Mazzariello family have described in their letters the impact David's situation has had on the family, the special relationship

7

## II.  OFFENSE CONDUCT

Mr. Mazzariello pleaded guilty to one count of mail fraud and one count of conspiracy to defraud the Internal Revenue Service. There is no doubt about his guilt, but some disagreement between the parties about the exact nature of the underlying offense conduct.  Mr. Mazzariello has submitted a lengthy statement of the offense to the probation office, which has been incorporated as an addendum to the Pre-Sentence Report ("PSR").  We will not repeat that statement in full in this memorandum, as it speaks for itself, but instead address below the outstanding issues between the parties relating to the offense.

In our objections to the PSR, we challenged the loss figure used to calculate the applicable guideline range, and contended that the correct figure was lower, resulting in a 3-level reduction in the applicable guideline range.  Since submitting that objection, and after further discussion, defendant has decided to withdraw his challenge to the loss figure, and corresponding guideline range, advanced by the government.[1]  We still believe there are important factual points to be made with respect to Mr. Mazzariello's involvement in the scheme; however, it is our view

---

[1]    In conceding the loss figure in the PSR for purposes of this sentencing, defendant does not also concede that this figure is appropriate for other purposes, such as calculation of his civil tax liability.  That issue will be resolved in a different forum, according to different legal standards, and defendant wishes to reserve his right to contest the dollar figure that properly should be charged to him as income.

he has with his father, and the vital role Mr. Mazzariello has played in helping his son to deal with the medical problem.

Mr. Mazzariello received high evaluations from all his employers, including NYL. He was discharged by NYL in late January 2001, after the investigation that led to the pending charges was first brought to his attention. Since then, he has struggled daily with the anxiety and uncertainty brought on by his legal situation. He found work in May 2001 with ADS Financial Services, a smaller company located in Quincy, Massachusetts. He has a flexible commuting/work schedule with ADS as well, working from home on Mondays and Fridays. He typically drives to Massachusetts on Tuesday mornings and returns Thursday evenings, so as to minimize the amount of time he is away from his family.

The legal situation has been extremely stressful as it relates to his current employment. Mr. Mazzariello had not been charged with a crime when he was hired by ADS, and the company is unaware of his current situation. He has received consistently excellent evaluations and enjoys a good relationship with ADS, which he hopes and expects would survive if a non-custodial sentence were imposed in this case. However, because his fate is unknown he has not known exactly what to tell ADS, or when. This uncertainty has also weighed heavily on Mr. Mazzariello.

that they are more appropriately considered as mitigating factors,
or reasons why the loss figure and corresponding guideline range
significantly overstate the seriousness of the crime for Mr.
Mazzariello and warrant either a substantial downward departure or
a non-guideline sentence.  We discuss below the key points
distinguishing Mr. Mazzariello's offense conduct.

1.    Defendant's Understanding Of The Nature
      and Genesis of the Criminal Conduct

      The charges in this case focus on business dealings between
NYL and Softcraft Labs, a Connecticut-based computer consulting
firm that did extensive business with NYL, and specifically certain
funds paid by NYL to Softcraft that came to be known as "the
surplus."  The government alleged that Mr. Mazzariello and his co-
defendant Robert Keller conspired to defraud NYL by diverting NYL
money to Softcraft by fraudulent means, and then using those monies
for their personal benefit.  The tax charge arises from the failure
to report personal benefits received on the defendants' individual
tax returns.

      At the outset, there should be no doubt about Mr.
Mazzariello's guilt, or his acceptance of responsibility.  He has
admitted that as a result of the "surplus" arrangement he received
benefits he was not entitled to receive, caused or allowed funds to
be expended for unauthorized purposes, and did not report any
improperly received benefits on his tax returns.  Mr. Mazzariello
clearly recognizes that this conduct was criminal and wrong, and
has said so in his statement of the offense.

The main difference between the parties concerns the genesis of the "surplus," and Mr. Mazzariello's intent and knowledge at the outset of the "surplus" arrangement. The government's theory appears to be that the "surplus" was fraudulent from the start; its loss calculation is based on the assumption that all monies paid by Softcraft to NYL at the end of 1998 and 1999 were part of a fraudulent scheme. Our position, on the other hand, is that the "surplus" as conceived, and as Mr. Mazzariello originally understood it was to work, was consistent with NYL's end-of-year billing practices. Under defendant's theory of the offense, the "surplus" became fraudulent because the dollars paid by NYL to Softcraft ultimately were not used entirely for the original stated purpose, i.e., Softcraft work for NYL, and instead were used with defendant's knowledge for other purposes.

As Mr. Mazzariello indicates in his statement of the offense, it was common NYL practice at the end of the calendar year for managers to attempt to identify expenses for the coming year that could be pre-paid with any unspent budget funds for that year. Toward the close of 1998, a pre-payment to Softcraft of $200,000 was discussed and agreed upon.[2] Mr. Mazzariello knew that

---

[2]    According to Mr. Hoyt, a similar payment of $50,000 was made near the end of 1997, under an arrangement reached with Mr. Keller. Softcraft did work throughout 1998 and drew against the $50,000 pre-paid credit to pay for that work.  There is no suggestion that this pre-payment or billing arrangement was in any way improper. Mr. Mazzariello was unaware of the 1997 pre-payment until receiving discovery from the government in this case, but it is consistent

Softcraft would be doing significant work for his departments in 1999, and he believed that the pre-payment would be drawn against to pay for that work.

Mr. Mazzariello was not the primary contact between NYL and Softcraft; Keller filled that role. Mr. Mazzariello also was not involved in the details concerning how the "surplus" would be billed or generated. He did initial two invoices in late 1998, each for approximately $75,000, approving them for payment by NYL.[3] The invoices admittedly were false and misleading, as they referenced work already done as opposed to future work to be done. Mr. Mazzariello did not direct that the invoices be prepared in this fashion, nor did he notice the problem prior to his approval. The two invoices initialed by Mr. Mazzariello bear Keller's handwriting referencing two approved projects to be performed by Softcraft in 1999. From Mr. Mazzariello's perspective, there would have been no reason to create false invoices, as the pre-payments to be generated were intended to be used for legitimate services.

The problem with the "surplus" arose later, when over time it was not used entirely as intended. It is undisputed that the "surplus" changed from a resource to be drawn against by Softcraft to pay for NYL work to a resource that was used, with Mr.

---

with his initial understanding of how the $200,000 1998 pre-payment was to be treated.
[3]    Of the six Softcraft invoices that comprise the government's loss calculation, these are the only two that bear Mr. Mazzariello's initials.  Mr. Keller had authority to approve items up to $50,000, and the other invoices fell below that threshold.

12

Mazzariello's knowledge and agreement, as essentially a supplemental budget, "parked" at Softcraft but available to be drawn against as needed for a variety of purposes. As we discuss below, though some payments from the surplus benefited Mr. Mazzariello personally, others were for legitimate business-related purposes.[4] However, they were not consistent with the representation made at the outset to NYL, that is, that the pre-payments would fund future Softcraft work. Mr. Mazzariello was fully aware of, and participated in, this use of the "surplus", and benefited in part from it; this conduct is at the heart of his guilty plea. However, as we also discuss below, he was not aware of and did not agree to other aspects of the charged fraud.

2.  Payment of Personal Credit Card and Other Bills

At various times, the surplus or other Softcraft funds were drawn against to pay American Express, SNET, or other personal bills. Mr. Hoyt has indicated that these payments were made at Keller's direction. PSR, ¶¶ 25-26, 30-33. Mr. Mazzariello did not know that credit card bills were being paid by Softcraft, out of the surplus funds or otherwise, and this use was contrary to his intention and understanding regarding how the surplus was to work.

---

[4]  We concede that even this category of business-related expenses is properly included in the amount of the fraud, since such payments, however defensible, were inconsistent with the representations made to NYL, i.e., that the pre-payments would fund Softcraft work. In our view, however, this distinction is most relevant to the question how one should evaluate and punish defendant's conduct.

He first learned of these payments during the investigative stage of this case, when the government shared with us a preliminary accounting of monies expended by Softcraft.  Mr. Mazzariello's conduct was consistent with his understanding; no personal bills of his were paid by Softcraft.

3.    Administration of The Surplus and Creation of False Invoices

Mr. Mazzariello's understanding of how the surplus was administered was that, whenever they would draw against the money Softcraft was holding, the surplus balance would be debited.  Mr. Hoyt, who took direction from Keller, has indicated that this was not in fact how the surplus operated.  According to Hoyt, Keller would sometimes instruct him to charge certain expenses against the surplus, but on other occasions would direct that Hoyt submit separate, false invoices to NYL to cover the expense in lieu of drawing charging the surplus.  PSR, ¶ 25.  Mr. Mazzariello did not direct the creation of such invoices, nor was he aware that they were being created.

We do not mean to suggest that this excuses Mr. Mazzariello's conduct.  As noted, Mr. Mazzariello readily acknowledges that drawing against the money pre-paid to Softcraft to use for other purposes was deceitful and wrong.  However, we believe it is also important for the Court to understand that the scope of Mr. Mazzariello's agreement, and the conduct for which he should be held accountable, does not include the separate submission of these allegedly false invoices.

Likewise, in a similar vein, Mr. Mozzarella never intended, or contemplated, that the surplus be used to buy golf timeshares, start his own 'dot-com' company, or purchase shares of Vignette stock for Mr. Mazzariello's benefit. See PSR, ¶ 17. Any statements made to that effect were either made without Mr. Mazzariello's knowledge, and certainly without his approval, or were misunderstood by Hoyt.

4.    Expenditures From The Surplus

As we have noted, most of the "surplus" expenditures Mr. Mazzariello agreed to and approved had a significant nexus to his work for NYL. We believe this point is very important, because it points up the shortcomings of the guideline system in a case like this, where crimes are evaluated solely on the basis of dollars without regard to how those dollars were spent. Put simply, Mr. Mazzariello's fraud should not be viewed the same as another fraud defendant who, for instance, defrauds his employer of money for more venal purposes, such as fueling a gambling or drug habit, or funding a more lavish lifestyle. Although Mr. Mazzariello unquestionably benefited from unauthorized surplus payments, in our view his principal sin was a belief that he could decide better than his employer how NYL's money should be spent.

One main category of expenditure from the surplus was home computer equipment and other technology. Cleary, the Softcraft pre-pay should not have funded these purchases. It is also clear, however, that Mr. Mazzariello had a legitimate need for an

extensive home office, and did in fact use that office computer equipment for work purposes, regularly laboring into the wee hours of the morning on his home computer. He should have gone through different channels to get the equipment, but it cannot be denied that the company benefited from Mr. Mazzariello's use of much of the equipment.

Likewise, Mr. Mazzariello and the others in his Emerging Technology group had a legitimate need to acquire and test cutting-edge technology to determine if it should appropriately be part of NYL's future technological plans. It is easy to dismiss certain high-tech items at "toys"; however, many of today's "toys" (e.g., high-speed internet connections; Blackberry wireless devices) become tomorrow's commonplace technology. As Chief Technical Officer of a Fortune 100 company, Mr. Mazzariello and his colleagues needed to be abreast of the most current technology. Some of the surplus monies were spent to acquire such items for evaluation. Once again, different and proper corporate procedures should have been followed, but there should be no doubt that Mr. Mazzariello's duties extended to the review of new products.

Some items purchased with the surplus, such as generators or cam-corders, cannot be justified under any circumstances as legitimate business-related expenditures. Mr. Mazzariello readily concedes the impropriety of these items, and does not claim them as proper corporate expenses.

16

Other improper expenditures from the surplus were motivated by a desire to boost morale among Mr. Mazzariello's employees and reward good work. By way of background, during the time frame in question, 1998-2000, the 'dot-com' boom was at its peak, and technically qualified employees were leaving NYL regularly to accept employment with newer, potentially more lucrative internet companies. Mr. Mazzariello and his managers were frustrated with the repeated experience of training personnel, only to see them depart for greener pastures, and thus wanted to foster an environment that would promote job happiness and encourage employees to stay. The surplus was used in part for such purposes.

For instance, Mr. Mazzariello approved the purchase of NYL watches and pens at the end of 1999 and 2000, respectively. These were used as Christmas presents for employees in his departments. Similarly, one of the cash payments drawn from the surplus was used as reimbursement for a golf outing that he and Keller had organized for his employees.

The surplus was also used in part to pay expenses for a NYL employee named James Paulsel. Mr. Paulsel apparently submitted false invoices to Softcraft, and was paid based on those invoices. Mr. Mazzariello was not aware of the invoices, but was aware of the payments to Mr. Paulsel. Mr. Paulsel was a tele-commuter; he lived in New Mexico and worked two weeks of every month in New York. Mr. Mazzariello's understanding was that Paulsel was to receive a flat expense annual expense allowance of $25,000, to be funded by the

surplus.  Although it clearly was wrong to pay those monies from the Softcraft pre-pays (even though Paulsel did work on Softcraft projects), Mr. Mazzariello did not believe that payment of such expenses to a worker such as Mr. Paulsel was, as a general proposition, improper.  In his experience, it was customary to pay the expenses of a tele-commuter (as had been done for Mr. Mazzariello when he worked for Midlantic in New Jersey and PNC Bank in Pittsburgh)[5] or an outside consultant/contractor.  From Mr. Mazzariello's perspective, a flat rate of $25,000 for annual expenses for someone who spent approximately 24 weeks a year in New York was a relative bargain, and certainly within the realm of what one would reasonably expect such a person to incur.[6]

Finally, toward the end of 2000, plans were made to use the surplus in part to pay for hiring an individual named Bob Capasso. PSR, ¶ 36.  Mr. Capasso was to work for Softcraft on an approved NYL project, but be paid much of his salary, as well as a starting bonus of $5-10,000, out of the surplus.  Id.  This idea originated with Mr. Mazzariello, and was a well-intentioned but misguided attempt to help a friend and possibly train a new employee.  Mr.

---

[5]    While at New York Life, Mr. Mazzariello periodically was required to stay overnight in the city for work purposes.  On these occasions, NYL routinely reimbursed his hotel and other expenses, with the knowledge and approval of Ms. Campbell, his immediate superior.

[6]    Paragraph 42 of the PSR states that Keller instructed Paulsel to divide $11,000 in bonus over-payments in three parts, between Paulsel, Keller and Mazzariello.  Mr. Mazzariello denies any knowledge of this $11,000 overpayment, and did not receive any share of those funds.

Mazzariello knew Capasso from his church. He saw him at a Juvenile Diabetes fundraiser in the Fall of 2000, and they discussed Mr. Capasso's difficulties making ends meet as a painter. Mr. Mazzariello respected Capasso's intelligence and work ethic, and had enjoyed similar success in the past hiring employees without extensive technical background. He knew that Capasso would not be hired by NYL without specific experience, but hoped, perhaps naively, that he could obtain appropriate training working for Softcraft on NYL projects. This experience would allow the parties to determine if Capasso was an appropriate candidate for future NYL employment in New York City. Since new NYL employees typically received a sign-on bonus of $5-10,000, Mr. Mazzariello intended to pay him that amount upon starting with Softcraft. The $12,000 in cash drawn from the surplus in December 2000, and found (intact) by the FBI when it searched Mazzariello's home in late January 2001, was intended to pay Capasso's starting bonus and purchase a computer for him to work at home.

In sum, although Mr. Mazzariello clearly engaged in misconduct, the crimes that bring him before the Court stand in stark contrast to typical financial or fraud crimes. In our view, as we discuss below, the characteristics unique to this case warrant treatment very different than would be required under the mandatory sentencing guideline system.

III. <u>SENTENCING CONSIDERATIONS</u>

1.   <u>The Relevant Law</u>

Under the Supreme Court's decision in <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the mandatory Sentencing Guidelines scheme, which results in the imposition of enhanced sentences based on judicially-determined facts, runs afoul of the United States Constitution.  The Court's remedy for this constitutional violation was, in essence, to render the guidelines advisory rather than mandatory by excising the relevant portion of the federal statutory sentencing scheme.  The relevant factors for the court to consider in imposing sentence remain, as they were before <u>Booker</u>, those enumerated in 18 U.S.C. § 3553(a).  The principal difference under <u>Booker</u> is that the ostensibly far-reaching factors set out in Section 3553(b) are no longer circumscribed by the mandatory Sentencing Guideline regime.

The Second Circuit, in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), offered guidance to district courts in the post-<u>Booker</u> sentencing era.  The court noted at the outset that "[t]he excision of the mandatory nature of the Guidelines does not mean that the Guidelines have been discarded." <u>Id</u>. at 111.  Instead, consistent with the remedy adopted in <u>Booker</u>, sentencing judges remain under a duty to consider the Guidelines, along with the other Section 3553(a) factors; however, they are not obligated to apply them.  The court distinguished between a "non-Guideline" sentence, which it defined as a sentence that is "neither within

20

the applicable Guidelines range nor imposed pursuant to the departure authority in the [Sentencing] Commission's policy statements," and a "departure," the traditional term for a sentence imposed outside mandatory guideline range but pursuant to traditional guideline rules governing such deviations from the Guidelines.  Crosby, 397 F.3d at 111 n.9.

The court in Crosby stated that a sentencing court normally will have to determine the Guideline range applicable to a particular offense.  The court left open the possibility that a sentencing court could dispense with precise determination of uncertain issues, such as relevant loss, if it intended to impose a non-Guidelines sentence regardless of the loss figure and articulated that fact on the record.  397 F.3d at 112.  The court in Crosby summarized its post-Booker guidance for sentencing courts as follows:

> First, the Guidelines are no longer mandatory.  Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a).  Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Crosby, 397 F.3d at 113.

We discuss below various factors that govern the possible imposition of both a Guidelines and non-Guidelines sentence in this case. Whatever route the Court determines to be appropriate, we believe the end result should be the same: a non-custodial sentence that will enable Mr. Mazzariello to remain with his family, work toward their support and the repayment of restitution and tax obligations arising from this prosecution, and provide necessary medical care and physical and emotional support to his young son as he deals with Juvenile Diabetes.

2.   The Sentencing Guidelines and Bases for Downward Departure

The Pre-Sentence Report fixes Mr. Mazzariello's offense level at 16, yielding a Guideline range of 21-27 months imprisonment. As noted, we believe that this sentencing range does not adequately take into account the various personal circumstances unique both to Mr. Mazzariello and the crimes at issue. Even under the former mandatory Sentencing Guideline system, consideration of individual offender characteristics played a vital and necessary role in the sentencing decision. Departures from the Guidelines are permitted when a case presents circumstances "of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553; U.S.S.G. § 5K2.0. Defendant submits that this is such a case.

The Supreme Court's decision in United States v. Koon, 518 U.S. 81 (1996) informs the general analysis of whether a downward departure is appropriate under Section 5K2.0 of the guidelines. In

Koon, the Court made clear that the Sentencing Guidelines were never intended to displace the fundamentally individual nature of the sentencing function, or to eliminate judicial discretion in fashioning an appropriate sentence:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge.  Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt [substantial deference/abuse of discretion].

Id. at 113.  The Court reaffirmed the power of the district court, subject to abuse of discretion review, to depart if it finds a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b).

The Koon decision also confirmed the breadth of the district court's discretion, stating that the guidelines "place essentially no limit on the number of potential factors that may warrant a departure."  518 U.S. at 106.  Unless a circumstance in question is flatly forbidden as a basis for departure, the sentencing court, "informed by its vantage point and day-to-day experience in criminal sentencing," must determine whether a particular factor takes the case outside the "heartland" of the applicable guideline.

Koon, 518 U.S. at 98, U.S.S.G. Chapter 1 Part A(4)(b)("heartland"
approach of guidelines for "typical cases"); see also United States
v. Galante, 111 F.3d 1029, 1033 (2d Cir. 1997).

The court may also base a departure decision on a combination
of factors that, considered alone, might not warrant a downward
departure.  See United States v. Rioux, 97 F.3d 648, 663 (2d Cir.
1996), United States v. Broderson, 67 F.3d 452, 459 n.1 (2d Cir.
1995).  With this principle in mind, we discuss various bases for
departure below.

a.    Conduct Outside The "Heartland"

The Court in Koon noted that the Guidelines are intended to
apply to the so-called "heartland" of criminal cases.  The
corollary to this principle is that, in an unusual case to which a
guideline applies "but where the conduct differs significantly from
the norm, the court may consider whether a departure is warranted."
U.S.S.G. Chapter 1, Introduction, Pt. A(4)(b).

We have discussed above the unusual circumstances that
distinguish the fraud in this case, and Mr. Mazzariello's
participation in it.  Mr. Mazzariello stands convicted of
defrauding his employer and the IRS based on his participation in
an admittedly improper scheme.  The gravamen of his crime, however,
was deceiving his employer into believing that certain funds were
being used to pay for Softcraft Labs work, when in fact (according
to Mr. Mazzariello's understanding and agreement) they were being
used for other purposes, many of which were business-related or

24

motivated by factors other than base personal gain.  It is the rare
fraud defendant, in our view, who upon 'stealing' funds from his
employer, uses those funds to buy Christmas presents for his
employees promoting the company's logo, or to pay for a golf outing
for his employees, or to help advance the career of a church
acquaintance.  Yet that is exactly what Mr. Mazzariello did here.

We do not mean to suggest that this excuses defendant's
conduct; as we have repeatedly stressed, it does not.  Nor do we
mean to suggest that Mr. Mazzariello did not personally benefit in
part from the money diverted from NYL to Softcraft.  However, it
would be equally misguided to pigeonhole Mr. Mazzariello into a
specific Guidelines box based solely on dollar figures, without
considering the factors unique to his case.  This case is in fact
outside the fraud and tax "heartland", and warrants a different
application of the Guidelines.

     b.   <u>Record of Civic, Charitable, and Prior Good Works</u>

Section 5H1.11 of the Guidelines provides that "civic,
charitable, . . . and similar prior good works" are not ordinarily
relevant in determining whether a sentence should be outside the
applicable guideline range.  As the Court made clear in <u>Koon</u>,
departures are permissible on this ground in "extraordinary" cases.

The letters the Court has received from the many people who
know Mike Mazzariello, and have benefited over the years from his
time and generosity, speak volumes about his commitment to his
community, and his record of charitable, civic and good works.  In

the background section of this memorandum, we discussed Mr.
Mazzariello's at-times incredible work schedule. It is quite
clear, however, that the commitment to work was not to the
exclusion of his commitment to the community in which he lives.
Mr. Mazzariello has given of himself unfailingly over the years, to
his churches (serving key roles in two separate parishes); to
schools and schoolchildren (offering, among other things, his
technical expertise and outstanding organizational skills); and to
youth sports (serving as a coach, and positively influencing those
privileged to be under his guidance).

       The letters to the Court make clear that Mr. Mazzariello's
service has been substantial and beneficial to his community.
Writers describe him as the type who is among the first to
volunteer for a task. Those who have worked with or observed him
coaching uniformly praise his exemplary behavior, and the positive
influence he brings to bear on youth sports -- an endeavor that
unfortunately all too often brings out the worst, rather than the
best, in people. We recognize that many defendants can point to
some public or civic work they have done in mitigation of their
crimes. However, the breadth and depth of support for Mr.
Mazzariello makes clear that his contributions have indeed been
extraordinary. It is only right that these extraordinary works be
recognized when deciding whether the Guidelines should be strictly
applied.

c.    Family Ties And Responsibilities

Section 5H1.5 of the Guidelines provides that "family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.5. Nevertheless, the Second Circuit has stressed that district courts have "considerable discretion to depart downwardly for extraordinary family circumstances." United States v. Califano, 978 F.2d 65 (2d Cir. 1992); see also United States v. Alba, 933 F.2d 1117 (2d Cir. 1991); United States v. Johnson, 964 F.2d 124 (2d Cir. 1992); United States v. Sharpsteen, 913 F.2d 59, 63 (2d Cir. 1990); United States v. Pena, 930 F.2d 1486 (10th Cir. 1991)(combination of aberrational behavior and family circumstances).

In our view, defendant's obligations with respect to his son's Juvenile Diabetes are extraordinary, and warrant a departure. Those who know the Mazzariello family have commented on the profound effect this illness has had on them. Mr. Mazzariello is extensively involved with his son and his illness. He provides necessary emotional support, and protection, helping his growing son to live as normal a life as possible in playing sports he loves, but always watching for telltale signs of diabetic seizure that sometimes only a parent can recognize. David's seizures, though unpredictable, most often occur in the middle of the night, and often he must be physically restrained in order to administer necessary nutrition or medication. Mrs. Mazzariello often requires

27

help in this task, and has had her oldest daughter to rely on if her husband is not present. She will soon be leaving the home to attend college, however, and Mr. Mazzariello's presence will be that much more vital.

Mr. Mazzariello's essential contributions toward his son's illness extend well beyond merely helping to restrain him during seizures. They share a special bond, and Mr. Mazzariello describes David as his "hero" because of the way in which he has dealt with his illness. David was 8 when diagnosed with diabetes, and is now 13. As he continues the transition through young adulthood, his father's influence will continue to grow. It is certainly fair to conclude that absenting Mr. Mazzariello from his son during this critical time in his life would have a deleterious effect on his development.

d.    Aberrant Behavior

Section 5K2.20 of the Guidelines permits a sentence below the applicable Guideline range in an extraordinary case "if the defendant's criminal conduct constituted aberrant behavior." U.S.S.G. § 5K2.20. Section 5K2.20 bars application of this departure rationale in certain circumstances, none of which apply here.

Mr. Mazzariello's participation in the offenses in this case are a marked departure from the manner in which he has always lived his life. He has always enjoyed excellent reviews from all of his

employers[7], including NYL.  Individuals who know him have uniformly
noted his high moral standards and good character.  The manner in
which he has lived his life is a testament to those standards, and
supports the conclusion that his conduct here was indeed an
aberration.  Departure is warranted on this basis as well.

*  *  *

In sum, based on some or all of the departure factors
discussed above, we believe that if the Court determines that the
Guidelines should be applied in this case, a significant downward
departure is warranted.  For the reasons we discuss below, in the
context of a non-Guidelines sentence, we believe that the correct
sentence here should not include incarceration.

3.    A Non-Guidelines Sentence Is Appropriate In This Case

Before the enactment of the Sentencing Guidelines, the
sentencing function principally required a determination of what
was just in a particular case, subject only to statutory minimum
requirements or other mandatory sentencing criteria.  The
Guidelines' effort to make uniform the sentencing decision may have
merit in certain cases, but in others they fail miserably to take
into account individual facts and circumstances.  This, we submit,
is one such case.

This case in particular points up the inadequacies of a
sentencing system that is principally number-driven.  Mr.

---

[7]    Mr. Mazzariello provided many years of job reviews to the
Probation Officer during his personal interview, and we understand
that this material has been provided to the Court.

Mazzariello's loss figure, which we have agreed not to contest, is approximately $318,000, and the Guidelines call for a sentencing range of 21-27 months imprisonment. To treat Mr. Mazzariello the same as, for instance, someone who steals that sum of money for purely personal gain or pleasure, is in our view simply improper, and blinks reality. To be sure, Mr. Mazzariello personally benefited from his crimes. However, he did not know of and did not agree to the most troublesome aspects of the criminal conduct before the court -- payment of personal bills from corporate funds, and creation and submission of falsified and fraudulent invoices. There should be some way to take these facts into account in the sentencing decision, yet the dollar-driven guidelines do not do so.

Further, Mr. Mazzariello has paid and will pay a steep price for those actions, in the form of felony convictions, restitution and tax obligations, and perhaps most importantly in personal and family suffering brought on by the legal situation that has loomed ominously over his life for more than four years. The personal nightmare that culminates in this sentencing began for Mr. Mazzariello in late January 2001, when his home was searched by the government investigators. He was not indicted until mid-2003. Mr. Mazzariello indicates that this case has haunted his thoughts virtually every hour of every day in the last four-plus years. The Guidelines do not adequately weigh such factors, and especially ignore the extent to which a defendant has already been punished by factors independent of incarceration.

The Guidelines also fail adequately to take into account one of the sentencing factors explicitly mandated for consideration under Section 3553(a) -- "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(2)(7). We will address at sentencing the amount of restitution we believe is appropriate here, but there is little doubt the Court will impose a restitution obligation on Mr. Mazzariello. If he is incarcerated, he will lose a high-paying job that will aid greatly in paying any restitution obligation, as well as any civil tax consequences arising from his conduct in this case. Such a result would harm both Mr. Mazzariello and his family and the financial interests of NYL. The Guidelines do not adequately account for the benefit to the victim that would flow from a non-custodial sentence.

Perhaps the most perplexing question about this case is also the most obvious one, in light of Mr. Mazzariello's background: Why? His involvement in criminal activity is extremely difficult to reconcile with the moral manner in which he has otherwise led his life. He had a lucrative job, and was not principally motivated by greed. Mr. Mazzariello offers insight into this question in his statement of the offense. He points to a combination of relative youth, arrogance, and overextension in his life. In light of his almost superhuman work and family schedule, it certainly makes sense that something had to be sacrificed. Here, in our view, in attempting to do what in retrospect was too much, Mr. Mazzariello, as he put it, sacrificed the moral footing

31

he was raised with.  His principal sin here was thinking he knew better than his employer how to spend its money, and how best to go about getting things done.  As a result, he used money earmarked for a very specific purpose and instead applied it toward a variety of other uses, focusing more on the ends than the means.  He recognizes now that what he did was wrong, and has learned greatly from his mistakes.

In our view, incarceration under these circumstances would serve no positive purpose.  No sentence would punish Mr. Mazzariello more than he has already punished himself, for involving his family in the tumult associated with his criminal charges and the attending, gnawing uncertainty that has dogged them for years.  Mr. Mazzariello has lived with this problem for more than four years.  He has learned from his mistakes, and is not likely to repeat them.  He is privileged enough to hold a position that likely would enable him to make right the financial wrongs he committed, which have led him to be before the Court for sentencing.  We urge the Court not to apply the Sentencing Guidelines in this case, and to impose a sentence that does not require incarceration.

THE DEFENDANT,
MICHAEL MAZZARIELLO

By _____
David T. Grudberg, ct01186
JACOBS, GRUDBERG, BELT & DOW, P.C.
350 Orange St.
P.O. Box 606
New Haven, CT 06503
phone:(203) 772-3100
fax: (203) 772-1691
email: dgrudberg@jacobslaw.com

## CERTIFICATION

I hereby certify that a copy of the foregoing was faxed, hand-delivered and/or mailed first class, postage prepaid on April 5, 2005 to:


Anastasia Enos, Esq.
Assistant United States Attorney
450 Main St.
Hartford, CT 06103

Hubert J. Santos, Esq.
Santos & Seeley, P.C.
51 Russ St.
Hartford, CT  06106

Jacqueline Carroll
U.S. Probation Officer
157 Church St. - 22nd Floor
New Haven, CT 06510

_____
David T. Grudberg